UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:23-cv-22148-DPG

ROSH CHODESH II LIMITED
PARTNERSHIP, *et al.*,

    Plaintiffs,

v.

JAN S. WIMPFHEIMER, *et al.*,

    Defendants.

_____/

## REPORT AND RECOMMENDATIONS

**THIS MATTER** is before the Court on the Motion to Dismiss Second Amended Complaint by Defendants Madison Gold LLC, Jan S. Wimpfheimer, and Schwell Wimpfheimer & Associates, LLP (ECF No. 72) ("Madison Gold's Motion"), and the Motion to Dismiss Second Amended Complaint by Defendants East Hudson Capital, LLC and White Road Capital LLC (ECF No. 71) ("East Hudson's Motion").[1] Plaintiffs filed a Consolidated Response brief (ECF No. 75), to which Defendants replied (ECF Nos. 80, 81). Upon consideration of the Motions, Response, and Replies, I recommend that Madison Gold's Motion be **GRANTED**. Because I conclude that any further attempt to state viable RICO claims would be futile, I recommend that Counts I and II be **DISMISSED with prejudice**. If the RICO claims are dismissed, there is no other claim over which this Court has original subject matter jurisdiction. Therefore, I recommend that Counts III through XII be **DISMISSED without prejudice** and East Hudson's Motion—which only seeks to dismiss Count XII—be **DENIED as moot**.

---

[1] This case was referred to me by the Honorable Darrin P. Gayles, United States District Judge, for a ruling on all pre-trial, non-dispositive matters and a report and recommendation on all dispositive matters. (ECF No. 48).

1

I. **BACKGROUND**

A. **Procedural History**

Plaintiffs' initial complaint asserted nine claims arising under state law and invoked the Court's diversity jurisdiction. (ECF No. 1). Finding that Plaintiffs had failed to sufficiently plead the citizenship of Defendants, the District Court ordered Plaintiffs to file an amended complaint. (ECF No. 15).

Plaintiffs then filed an Amended Complaint bringing claims under the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961 *et seq.*, and state law claims. (ECF No. 24). Plaintiffs asserted that the Court had federal question jurisdiction over the RICO claims and could exercise supplemental jurisdiction over the state law claims. (*Id.*). Defendants moved to dismiss the Amended Complaint. (ECF No. 30).

After briefing, the undersigned issued a Report and Recommendations, which found that the Court's exercise of personal jurisdiction over Wimpfheimer and Schwell Wimpfheimer & Associates ("SWA") was proper and venue in the Southern District of Florida was proper. (ECF No. 57). But Plaintiffs had not pled their RICO claims with sufficient particularity under Federal Rule of Civil Procedure 9(b) and were therefore due to be dismissed. (*Id.*). Because dismissal of the RICO claims eliminated the only claims for which this Court had original subject matter jurisdiction, the undersigned recommended dismissal of all claims. (*Id.*). The District Court adopted the Report and Recommendations and dismissed all claims without prejudice.

Plaintiffs filed the operative Second Amended Complaint on May 10, 2024. (ECF No. 66).

B.    Allegations[2]

Defendant Madison Gold is a company owned and operated by Defendant Jan Wimpfheimer and non-party Simche Daniel Fulda. (ECF No. 66 at ¶¶ 38, 40). Defendants East Hudson Capital and White Road Capital are engaged in the business of merchant funding, "which involves a lender's provision of an unsecured cash injection into a business with repayment based on a percentage of business sales." (*Id.* at ¶¶ 35, 37).

Broadly, Madison Gold and other entities controlled by Wimpfheimer and Fulda entered into Master Participation Agreements with East Hudson and White Road. (*Id.* at ¶¶ 42–44). Under these agreements, Wimpfheimer's companies would provide syndication funding for loans in exchange for participation in monies East Hudson and White Road received from merchant accounts and receivables. (*Id.*). The agreements contemplated that Madison Gold would make numerous contributions, each of which would be designated for one of nine distinct "Series." (*Id.* at ¶ 46). Each Series was a portfolio of different merchant loans; they were to be reported and accounted separately and maintained in separate bank accounts. (*Id.*). East Hudson and White Road were obligated to provide Madison Gold with an online portal that provided weekly status updates on merchant loans. (*Id.* at ¶ 45).

In the first quarter of 2022, East Hudson "became increasingly concerned" with Wimpfheimer and his various companies. (*Id.* at ¶ 63). Two companies controlled by Wimpfheimer and Fulda failed to timely fund an agreed-upon loan of $11,400,000 to East Hudson. (*Id.*). East Hudson demanded to know the identities of Madison Gold's investors, the commitments Madison Gold made to its investors, and what information was being reported to its investors. (*Id.*).

---

[2] The Second Amended Complaint makes the following allegations, which are assumed to be true. *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009), *abrogated on other grounds*, *Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

Wimpfheimer refused to disclose this information. (*Id.*). East Hudson requested that Madison Gold and East Hudson "phase out" of their agreement. (*Id.*).

Without disclosing the dispute with East Hudson, Wimpfheimer solicited Plaintiffs for an investment in Madison Gold in or around May 2022. (*Id.* at ¶¶ 49, 54, 62). He portrayed himself as an expert in merchant funding. (*Id.* at ¶ 50). In a text message exchange about Plaintiffs' potential investment in Madison Gold, Wimpfheimer asked Plaintiff Michael Hermelin, "Would you be interested in taking the discussion forward?" (*Id.* at ¶ 54). Michael responded, "I think so but we're still in discussions with various funds to understand their investment strategies. Tbh… your 12% is on the lower end of some of what is being offered to us." (*Id.*). Wimpfheimer replied, "Ok…. But remember that for $500,000 it's 15% and for $2m or more it's 18%." (*Id.*).

In a July 18, 2022 text message, Michael Hermelin asked Wimpfheimer, "Will the audit of your company be complete within the next 6 months? If so, would you be willing to let us read it?" (*Id.* at ¶ 55). Wimpfheimer responded, "Yes and yes." (*Id.*).

Plaintiffs and Madison Gold executed a "Side Letter" that required Madison Gold to maintain an asset-to-debt ratio of at least 2:1 and notify Plaintiff within three business days of becoming aware that the ratio fell below 2:1. (*Id.* at ¶ 57). If the asset-to-debt ratio fell below 2:1, Plaintiffs would have the right to demand payment of all outstanding sums and unpaid interest within 30 days. (*Id.* at ¶ 58). Defendant SWA, of which Wimpfheimer is the managing partner, prepared non-disclosure agreements, which the Plaintiffs signed. (*Id.* at ¶¶ 80, 90). Wimpfheimer did not advise Plaintiffs to seek independent representation for the business transaction. (*Id.* at ¶ 86).

Plaintiffs made the following investments in Series I of Madison Gold. Rosh Chodesh II Limited Partnership invested a total of $1,750,000: $1,000,000 on July 24, 2022, and $750,000 on

4

September 28, 2022. (*Id.* at ¶ 52). David Hermelin and Michel Hermelin each invested $240,000 on September 13, 2022. (*Id.*). Joshua Hermelin invested $120,000 on September 13, 2022. (*Id.*). Plaintiff Snow White Trust II UAD invested a total of $700,000: $500,000 on September 28, 2022, and $200,000 on January 20, 2023. (*Id.*). "Plaintiffs were led to believe that their $3+ million investments were just a small part of Defendants' purported $100+ million investment funding operation." (*Id.* at ¶ 106).

In May 2023, Plaintiffs became aware that at some earlier date, White Road had commingled the funds of various Series. (*Id.* at ¶ 68). White Road diverted to East Hudson contributions made by Madison Gold through a different Series. (*Id.*).

Plaintiffs also discovered allegations that entities controlled by Wimpfheimer made loans in New York with interest rates ranging from 41 to 67 percent, in violation of N.Y. Penal Law § 190.40. (*Id.* at ¶¶ 74–75). Further, Wimpfheimer failed to disclose that he personally had ownership interests in East Hudson and White Road and was paid to be an investment promoter for them. (*Id.* at ¶¶ 81–83). Finally, Wimpfheimer and Fulda "engaged in self-dealing by siphoning business opportunities and funds away from Madison Gold and taking for themselves the profits . . . [and] through their taking of excessive fees." (*Id.* at ¶¶ 95–96).

Plaintiffs assert twelve claims. Count I is a Civil Racketeering (RICO) claim, in violation of 18 U.S.C. § 1962(c), against Wimpfheimer and Madison Gold. In Count II, Plaintiffs allege that Wimpfheimer, Madison Gold, and SWA conspired to violate 18 U.S.C. § 1962(c), in violation of § 1962(d). Count III is a Fraudulent Inducement claim against Wimpfheimer and Madison Gold. Count IV is a Breach of Fiduciary Duty claim against Wimpfheimer. Count V is a Negligent Misrepresentation claim against Wimpfheimer and Madison Gold. Count VI is a Conversion claim against Wimpfheimer. Count VII is a claim for Rescission of Contract against Madison Gold.

Count VIII is an alternative claim for Breach of Contract against Madison Gold. Count IX is a Negligent Retention and Supervision claim against SWA. Count X is a Florida Deceptive and Unfair Trade Practices Act claim against Wimpfheimer and Madison Gold. Count XI is a claim under the Delaware Limited Liability Company Act against Madison Gold. Finally, Count XII is an action for Accounting against Madison Gold, East Hudson, and White Road.

### C. The Motions to Dismiss

Madison Gold, Wimpfheimer, and SWA move to dismiss the Second Amended Complaint on many grounds. First, they argue that the Court cannot exercise personal jurisdiction over Wimpfheimer or SWA. Then, Plaintiffs' RICO claims should be dismissed because they are barred by the Private Securities Litigation Reform Act (PSLRA), fail to state a claim, and fail to satisfy Rule 8. Next, the Court lacks diversity jurisdiction. Because the RICO claims should be dismissed, the Court should decline to exercise supplementary jurisdiction over Plaintiffs' state law claims. Moreover, Counts III, V, and X fail to satisfy the pleading standard of Rule 9(b). Finally, all of Plaintiffs' state law claims should be dismissed for failure to state a claim in myriad ways.

The only claim asserted against East Hudson and White Road is Count XII, the action for accounting. They move to dismiss Count XII for failure to state a claim.

After thorough review of the briefing and the law, I conclude that Plaintiffs' RICO claims are barred by the PSLRA Amendment of 18 U.S.C. § 1964(c). Therefore, there is no claim over which this Court has federal question jurisdiction. I further conclude that the Second Amended Complaint fails to establish the existence of diversity jurisdiction. After dismissal of the RICO claims, there is no claim over which this Court has original subject matter jurisdiction. Accordingly, the Court should decline to exercise supplemental jurisdiction. Because a federal court is without power to do anything without subject matter jurisdiction, I do not address any of

the other grounds raised by the Motions to Dismiss. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'").

## II.     SUBJECT MATTER JURISDICTION

Federal courts are courts of limited subject-matter jurisdiction. *Thermoset Corp. v. Bldg. Materials Corp. of Am.*, 849 F.3d 1313, 1317 (11th Cir. 2017). When a plaintiff files suit in federal court, she must allege facts that, if true, show federal subject matter jurisdiction over her case exists. *Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1268 (11th Cir. 2013). If a complaint's factual allegations do not assure the court it has subject matter jurisdiction, then the court is without power to do anything in the case. *Id.* at 1269.

## III.    DISCUSSION

### A.     The PSLRA Bars Plaintiff's RICO Claims

The district courts have original subject matter jurisdiction over all civil actions arising under the laws of the United States. 28 U.S.C. § 1331. Section 1964(c) of Title 18, United States Code, establishes a civil cause of action for a defendant's violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. Therefore, the Court may exercise subject matter jurisdiction over this case if Plaintiffs state a viable RICO claim. For the following reasons, I conclude that they do not.

#### 1.     The PSLRA Amendment

In 1995, Congress amended the federal RICO statute by enacting § 107 of the Private Securities Litigation Reform Act (PSLRA). *Eagletech Commc'ns Inc. v. Citigroup, Inc.*, No. 07-60668-CIV, 2008 WL 3166533, at *9 (S.D. Fla. June 27, 2008). Specifically, 18 U.S.C. § 1964(c)

now provides, "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."

The PSLRA bar in § 1964(c) is construed broadly and is not contingent on the plaintiff pleading securities fraud as a predicate act. *Licht v. Watson*, 567 F. App'x 689, 693 (11th Cir. 2014). "A plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." *Id.* (cleaned up) (quoting *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 331 (3d Cir. 1999)). The PSLRA bar applies even where the plaintiff lacks standing to pursue a securities fraud action against the defendant. *See id.*; *Adams v. Rothstein*, No. 11-61688-CIV, 2012 WL 1605098, at *5 (S.D. Fla. May 8, 2012) ("[T]he PLSRA bar applies regardless of whether a plaintiff can or does plead a cause of action under the securities laws.") (collecting cases).

To define what constitutes conduct "actionable as fraud in the purchase or sale of securities," courts have consulted Section 10(b) of the Securities Exchange Act of 1934, which makes it unlawful to employ a deceptive device "in connection with the purchase or sale of any security." *See Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 644 (S.D.N.Y. 2017); *Loftin v. KPMG LLP*, No. 02-81166-CIV, 2003 WL 22225621, at *4 (S.D. Fla. Sept. 10, 2003). The Supreme Court has explained that fraudulent conduct is "in connection with" the purchase or sale of securities when the alleged fraud "coincides" with securities transactions and the events are "not independent." *Adams*, 2012 WL 1605098, at *5 (citing *SEC v. Zandford*, 535 U.S. 813, 820, 822, 824 (2002)).

"In determining whether misrepresentations coincided with the purchase or sale of securities, courts consider the allegedly fraudulent scheme as a whole." *Zohar*, 286 F. Supp. 3d at

8

645; *see Licht*, 567 F. App'x at 693 ("Although Licht alleges that the defendants also engaged in wire fraud and mail fraud, this conduct was in furtherance of the defendants' overarching scheme to commit securities fraud."); *Starks v. Chuhak & Tecson, P.C.*, No. 17-62366-CIV, 2018 11182716, at *10 (S.D. Fla. June 6, 2018) ("Section 10(b)'s 'in connection with' requirement [is] satisfied where the purchase or sale of a security and the proscribed conduct are part of the same fraudulent scheme." (cleaned up)). While "a single securities transaction that coincides with the fraudulent scheme can be the death knell of a RICO claim," fraud that is "separate and apart from" or occurs "well after" the sale of securities does not coincide with a securities transaction. *Zohar*, 286 F. Supp. 3d at 650, 647; *Wolff v. Leadenhall Bank & Tr.*, No. 03-22778-CIV, 2005 WL 8165194, at *3 (S.D. Fla. Apr. 1, 2005); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 242 (S.D.N.Y. 2006) ("[A]n otherwise legitimate stock transaction that is antecedent, but not integral, to the alleged fraud does not meet the 'in connection with' requirement."); *D'Addario v. D'Addario*, 75 F.4th 86, 93–94 (2d Cir. 2023) ("[I]t is not enough for securities to be an incidental feature of an overall scheme.") (citing cases in 9th, 6th, and 7th Circuits).

### 2. Predicate Acts

Plaintiffs allege that Wimpfheimer and Madison Gold "devised and executed a scheme to fraudulently obtain and retain money from Plaintiffs and others through . . . material misrepresentations and/or the omission and concealment of material facts." (ECF No. 66 at ¶ 188). Specifically, "in furtherance of the Enterprise's scheme to defraud, Wimpfheimer misrepresented: (i) the rate of return Plaintiffs would receive on their investment, (ii) the transparency associated with investments in Madison Gold, and (iii) the volume of Plaintiffs' investment in relation to Madison Gold's total funds." (*Id.* at ¶ 189). Wimpfheimer also "omitted and concealed" that East Hudson no longer wanted to do business with Madison Gold. (*Id.* at ¶ 190). "Because the

9

Complaint alleges a single, ongoing fraudulent scheme, all of Defendants' alleged acts must be considered together." *Zohar*, 286. F. Supp. 3d at 648.

First, we must determine whether Plaintiffs' investment in Madison Gold was a securities transaction. Without a doubt it was. One of the many items that constitute a "security" under the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), is an "investment contract." An investment contract is a transaction that features an investment of money in a common enterprise with the expectation of profits to be derived from the efforts of others. *See S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999) (citing *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946)). "This analysis is 'flexible,' with substance and economic reality emphasized over form." *Starks*, 2018 WL 11182716, at *8 (citing *S.E.C. v. Mut. Benefits Corp.*, 408 F.3d 737, 743–44 (11th Cir. 2005)). In this case, East Hudson and White Road were in the business of lending money to merchants in exchange for a percentage of a merchant's sales. Madison Gold provided syndication funding to East Hudson and White Road for these loan transactions. In reliance on Wimpfheimer's statement that a two-million-dollar investment would result in an 18 percent return, Plaintiffs invested over three million dollars in Madison Gold. In other words, Plaintiffs made an investment of money in a common enterprise where their prospect of profit rose and fell with other investors, with the expectation that they would passively receive profits.

Next, the Court considers whether the fraudulent scheme alleged is "conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). Section 10(b) of the '34 Act makes actionable the use of any manipulative or deceptive device in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b). A deceptive device is used in connection with a securities transaction when "the scheme to defraud and the sale of securities coincide." *Zandford*, 535 U.S. at 822.

Plaintiffs assert that Wimpfheimer's statement that Plaintiffs would receive an 18 percent return on a two-million-dollar investment "harmed" Plaintiffs "because the high rate of return quoted to them influenced their decision to invest their money in Madison Gold rather than other investment opportunities." (*Id.* at ¶ 194).

Then, Wimpfheimer's statements that Plaintiffs would "get the same rights as other[s] who invested the same amount" and that he "wouldn't give some of these terms for less than" a one-million-dollar investment gave Plaintiffs a "false sense of security" that enabled Wimpfheimer and Madison Gold "to fraudulently obtain funds from Plaintiff[s] by deceiving them into believing there were many investors in Madison Gold." (*Id.* at ¶¶ 199–203).

Plaintiffs' "false sense of security" was further bolstered by Wimpfheimer's statement that he would let Plaintiffs read the audit of Madison Gold and by the Side Letter that required Madison Gold to quickly notify Plaintiffs if the asset-to-debt ratio fell below 2:1; this would have allowed Plaintiffs to demand return of their investment. (*Id.* at ¶¶ 205, 208, 209, 214). However, Plaintiffs never received an audit of Madison Gold, and Wimpfheimer failed to notify Plaintiffs that Madison Gold's asset-to-debt ratio fell below 2:1 and that "Madison Gold didn't have enough funds to pay its investors." (*Id.* at ¶¶ 206, 212).

Finally, Wimpfheimer concealed that East Hudson, "an entity instrumental in Madison Gold obtaining merchant cash advance transactions," wanted to "phase out" of its relationship with Madison Gold, which was "material information" that should have been disclosed to Plaintiffs during communications that occurred in May, June, and July 2022—the time during which Wimpfheimer was soliciting an investment from Plaintiffs. (*Id.* at ¶¶ 223, 225).

By Plaintiffs' own account, Wimpfheimer's misrepresentations and omission were employed for the purpose of getting Plaintiffs to invest in Madison Gold, and Plaintiffs were

11

harmed by making an investment that they would not have made had they known the truth. Thus, the fraudulent scheme Plaintiffs allege would have been actionable as securities fraud, and the PSLRA bar applies.

Plaintiffs argue that the RICO claims are not barred by the statute because Defendants' post-investment retention, commingling, and illicit diversion of Plaintiffs' funds form a "large part" of the basis for their lawsuit. (ECF No. 75 at 12–13). They rely on *Wolff v. Leadenhall Bank & Trust* for the proposition that "the PSLRA does not bar a RICO claim where a plaintiff has alleged post-investment or post-loan fraudulent acts." No. 03-22778-CIV, 2005 WL 8165194, at *3 (S.D. Fla. Apr. 1, 2005).

*Wolff* does not stand for the notion that any allegation of fraudulent acts that took place after the purchase of securities overcomes the PSLRA bar. On the contrary, *Wolff* fits quite comfortably in the body of cases that recognize "an otherwise legitimate stock transaction that is antecedent, but not integral, to the alleged fraud" does not make the scheme securities fraud. *Leykin*, 423 F. Supp. 2d at 242; *see D'Addario*, 75 F.4th at 93; *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 872 (9th Cir. 2010); *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 791 (6th Cir. 2012); *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 335 (7th Cir. 2019). In *Wolff*, Judge Jordan held that the PSLRA did not bar the plaintiffs' RICO claim because "the Cash 4 Titles loan business was a legitimate business opportunity, but later became a massive scheme to misappropriate the loan proceeds." 2005 WL 8165194, at *3 (citations and quotations omitted).

The PSLRA Amendment sought to "prevent litigants from using artful pleading to bootstrap securities fraud cases into RICO cases, with their threat of treble damages." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011). For this reason, courts look at the

fraudulent scheme as a whole to determine whether it would be actionable as securities fraud. *See Zohar*, 286 F. Supp. 3d at 645; *Licht*, 567 F. App'x at 693; *Starks*, 2018 11182716, at *10. In *Licht*, the panel held that although the defendants allegedly engaged in wire and mail fraud, "this conduct was in furtherance of the defendants' overarching scheme to commit securities fraud." 567 F. App'x at 693. Similarly, in this case, the "purchase of [securities] was integral to the scheme to defraud since, without it," Defendants would not have been able to retain, commingle, and divert Plaintiffs' funds. *See Zohar*, 286 F. Supp. 3d at 649.

In two analogous cases, courts of this District reached the same conclusion. In *Adams v. Rothstein*, plaintiffs were induced to purchase interests in limited partnerships by an offering memorandum. 2012 WL 1605098, at *1. The memorandum explained that the investors' money would be pooled to buy judicial settlements from litigants who sold their right to receive the full settlement amount in exchange for an immediate pay-out. *Id.* No such settlements were ever purchased; in reality, the plaintiffs had invested in a Ponzi scheme. *Id.* at *2. Judge Cohn held that the PSLRA applied "despite [p]laintiffs' attempt to distinguish their purchase of securities" from fraud in connection with the "bogus structured settlements" because the plaintiffs' only connection to those settlements was through the securities they purchased. *Id.* at *5.

In *Goldberg ex rel. Jay Peak, Inc. v. Raymond James Financial, Inc.*, plaintiffs were foreign investors hoping to earn permanent residence in the United States by investing in U.S. projects that create jobs. No. 16-21831-CIV, 2017 WL 7791564, at *1 (S.D. Fla. Mar. 27, 2017). The defendants solicited them to purchase interests in limited partnerships whose funds would be used for the creation of hotels, cottages, and a biomedical research facility, among other things. *Id.* While some of the funds were used for these projects, the majority were commingled, misused, and diverted to pay for other projects and personal expenses. *Id.* The plaintiffs argued that the

PSLRA did not bar their RICO claims because, although the case "involve[d] the sale of securities, the focus of the RICO claims [was] not the sale of securities but what was done afterwards with the money raised from the sales." *Id.* at *9 (cleaned up). Judge Leonard rejected this argument, noting that "to constitute 'conduct actionable as fraud in the purchase or sale of securities,' the alleged fraud only needs to be 'in connection with' the purchase or sale of securities." *Id.* at *10 (quoting *Adams*, 2012 WL 1605098, at *5). The misappropriation of the funds was sufficiently connected to the sale of securities, which the defendants made for the purpose of diverting funds for unauthorized purposes. *Id.* at *9.

Plaintiffs' RICO claims rely on "conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). Defendants' alleged retention, commingling, and diversion of Plaintiffs' funds coincided with the investment in Madison Gold; those acts did not form an independent fraudulent scheme separate and apart from the investment. Accordingly, these claims are barred by the statute. Because Plaintiffs' RICO claims are due to be dismissed and the Second Amended Complaint asserts no other claims arising under federal law, the Court cannot exercise federal question jurisdiction over this action.

### B.    Diversity Jurisdiction

A district court has subject matter jurisdiction over a civil action where the matter in controversy exceeds $75,000 and is between: (1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state; or (3) citizens of different states and in which citizens or subjects of a foreign state are additional parties. 28 U.S.C. § 1332(a)(1)–(3). The burden of persuasion for establishing diversity jurisdiction rests with the party asserting it. *Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010).

Jurisdiction under § 1332(a)(1) requires complete diversity of citizenship; every plaintiff must be diverse from every defendant. *Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1224 (11th Cir. 2013). For purposes of diversity jurisdiction, a limited partnership or limited liability company is a citizen of any state of which a partner or member is a citizen. *Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990); *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004). "[T]he pleading of every member's citizenship is essential to establishing diversity jurisdiction." *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1088 (11th Cir. 2010).

The Second Amended Complaint asserts, "this Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00." (ECF No. 66 at ¶ 23). But Plaintiffs have not alleged the names and citizenship of each partner of Rosh Chodesh II Limited Partnership and SWA, and each member of Madison Gold, East Hudson Capital, and White Road Capital. On that basis alone, Plaintiff's complaint fails to establish diversity jurisdiction.[3]

Further, Madison Gold's Motion argues that diversity jurisdiction does not exist. (ECF No. 72 at 22–23). Yet Plaintiffs' Response makes no mention of diversity jurisdiction whatsoever. Thus, Plaintiffs have conceded the argument. *See Worley v. Carnival Corp.*, No. 21-CIV-23501, 2023 WL 1840154, at *2 (S.D. Fla. Jan. 30, 2023) (collecting cases).

### C.   Supplemental Jurisdiction

In a civil action where the district court has original subject matter jurisdiction, the court may exercise supplemental jurisdiction over all other claims that are so related to the original claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a). In order to invoke

---

[3] The Court ordered Plaintiffs to amend their first Complaint because it failed to sufficiently plead the citizenship of Defendants. (ECF No. 15).

15

supplemental jurisdiction, the court first must have original jurisdiction over at least one claim in the action. *Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1565 (11th Cir. 1994). When all claims for which the court had original jurisdiction have been dismissed, the court may decline to exercise supplemental jurisdiction over the related claims. 28 U.S.C. § 1367(c)(3).

Although the court's ability to decline jurisdiction is discretionary, the court "ordinarily should kick the case to state court" when all original jurisdiction claims have been dismissed. *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. ____, 2025 WL 96212, at *5 (Jan. 15, 2025) (parentheses omitted); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018). On occasion, courts have chosen to exercise supplemental jurisdiction over state law claims after they dismissed all claims for which the court had original jurisdiction because the court had already invested substantial judicial resources in the supplemental claims or the resolution of the supplemental claims on the merits was obvious. *See* WRIGHT & MILLER, FED. PRAC. & PROC. § 3567.3 nn.77–81. This case presents neither of those situations. Therefore, I recommend that the District Court decline to exercise supplemental jurisdiction and dismiss Plaintiffs' state law claims without prejudice.

**IV.     RECOMMENDATION**

For the foregoing reasons, I recommend:

(1)     The Motion to Dismiss Second Amended Complaint by Defendants Madison Gold LLC, Jan S. Wimpfheimer, and Schwell Wimpfheimer & Associates, LLP (ECF No. 72) be **GRANTED**;

(2)     Counts I and II be **DISMISSED WITH PREJUDICE**;

(3 )    Counts III through XII be **DISMISSED WITHOUT PREJUDICE**; and

(4)     The Motion to Dismiss Second Amended Complaint by Defendants East Hudson Capital, LLC and White Road Capital LLC (ECF No. 71) be **DENIED AS MOOT**.

A party shall serve and file written objections, if any, to this Report and Recommendations with the Honorable Darrin P. Galyes, United States District Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida, this 4th day of February, 2025.

_____
LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE